Good morning. May it please the Court, I'm Linda Ziskin, attorney for Plaintiff Mickey Webb. I'd like to reserve one minute. You may, and why don't you pull the mic down just a little bit so you don't have to look over it. I hate a telephone booth. Thank you. This is a case not so much about burdens of proof as it is about benefits of the doubt. Mr. Webb was denied a full fair hearing because he was summarily ousted at step two of the five-step sequential analysis. He does have the burden of proof at step two, and this is all the more reason why he should be given the benefit of the doubt. He needs to show that he has a severe impairment at step two. The ALJ did find that he had two medically determinable impairments. One of those was hypertension, high blood pressure. The other were the residual effects of a horrific accident that occurred in 1987, which was four years before his alleged onset of disability. He was riding an ATV motorcycle at the coast here in Oregon, and there are dunes. He went over a dune. He parted company with the ATV, which then proceeded to land on top of him, crushing his torso. This in and of itself should satisfy the de minimis requirement because not only were his ribs fractured, they were more than fractured. His back was essentially broken with six ribs, which I think is all the ribs that you have on one side, separated from the spine. In addition, his heart was bruised, his liver was lacerated, and a lung was punctured. He also suffered fractures to the face, and the orbit of his eye was blown out, so to speak. The bottom of the orbit was fractured. It takes a long time to recover from injuries like that. Four years is not a very long period of time. He did undergo quite a bit of medical rehabilitation, and there are ample medical records which predate the AOD. However, he did go back to work immediately. He loved his job, and he went back to work and found that he could not sustain it. What happened was in 1991, unbeknownst to him, he developed high blood pressure. This in combination with the residual effects of this accident combined to make it impossible for him to continue working. Therefore, he quit his job. He thought he could take a couple of months off, recuperate, and then go back to work. He tried to do that. He tried a couple of jobs. He lasted about two weeks at one job at a Christmas tree farm, left in tears because he was simply asked to stay overtime and work a little more, could not handle the pressures of that job, and lasted two days at an equipment rental yard where he found he just couldn't do the physical labor. Taken together, we've surmounted that de minimis standard, which is that you have to have an impairment that is so slight that it could not possibly cause disability. Just a common sense reading of the facts in this case show that Mr. Webb has a severe impairment. Where do you get the language de minimis and so slight as it could not possibly cause impairment? Is that a gloss you put on it, or is that for some reason? No, I don't think it's a – it may be a gloss, but I think Justice O'Connor may have put it on in Bowen v. Yuckert. Actually, the de minimis standard – De minimis comes from Smolin v. Chater. Yeah, we have Smolin v. Chater. That's correct, Your Honor. Thank you. De minimis screening device? Is that what you're referring to? Yeah, it's an administrative screening device. I don't – No, I said a de minimis screening device, not an administrative device. It was characterized as an administrative – I'm reading the language. Screening device. De minimis screening device to dispose of groundless claims. I'm just trying to help you identify where the Latin came from. I appreciate it. Thank you. I was confused because she also – I think you may have put a gloss on it, but at least de minimis. Okay. Thank you. There are also several Social Security rulings that deal with this question as well. And whether it's a gloss or just kind of a summation for you of the thinking in this area is that it's a very small, very slight impairment that is going to have no more than a minimal effect on a claimant's ability to work. And the fact that he showed that he couldn't sustain work is, in and of itself, evidence that should get him past Step 2. The other troubling aspect of this case – If he subjectively feels that he can't work, that should get him by. Well, he subjectively feels he can't work, and there is objective evidence to support the symptoms as related to his medical impairments, which in SSR 96-3P is one of the factors that are looked at. It's important to point out that the judge, the ALJ, did determine that he had these two medically determinable impairments, which signifies in and of itself that there was objective medical evidence in the record to support his claim. The ALJ just didn't go the one step further, which is now to combine the two impairments that he found to be medically determinable, his high blood pressure plus all of these musculoskeletal problems that were a result of the ATV accident. The troubling aspect of this case, to my way of thinking, is a factual error made by the ALJ. He said that for two years during the relevant period of time, which is the period of time between the onset of disability date that is alleged and the date last insured, that during this period of time there's a two-year hole in which the claimant did not go to the doctor. This is just simply not true. An examination of the record shows that he went to the doctor, he had five appointments during a two-year period, plus 18 more times he walked into the doctor's office as he was instructed to do to have his blood pressure checked. So he did go to the doctor during those two years. That mistake, all by itself, calls for a remand to clarify this issue. This finding of fact is in error by the ALJ, and under CCB Chenery it must go back to finder of fact to clarify this ambiguity. There are ambiguities in the record as to the medical records. At the hearing there was some discussion between the ALJ and the clerk as to some records that were missing. This, together with this really blatant error, call for a remand to properly develop this record, first of all, and then to evaluate Mr. Webb's impairments beyond step two. He's not asking for the moon here. He doesn't necessarily. He just wants his date in court. There were some objective findings which verified the subjective complaints regarding his back. My notes indicate that his 96 lumbar X-rays were normal and an MRI of his left knee showed mild degenerative changes. Do you claim that that degenerative change is traumatic in origin? Well, it's a mild degenerative change that was a result of his injury. And, Your Honor, did you say that was in 1991? That's at the very beginning of his period of relevance here. It got worse between 1991 and 1997. I thought his left knee wasn't involved in the ATV accident. It was all the ribs. I'm sorry, I didn't hear you, Your Honor. I thought that the left knee was not involved in the ATV accident. It was all the ribs. It was his torso, you're correct. The left knee was determined to be an arthritis-related disease called Reiter's syndrome. At this point... Traumatic in origin? No, it would be osteoarthritic developing in the knee as a result of a systemic predisposition now to arthritis because of the changes in his spine and the other areas that were injured. I would suggest that there's not enough evidence there for an ALJ to make a decision that there is no severity to that particular impairment. He was never sent out for a consultative examination. And I'd like to point out that in the Bowen B. Yuckert case, at least Janet Yuckert was sent out for a consultative examination, and that case was remanded for further evaluation at Step 2. So great care must be exercised, as the Social Security ruling says, in making this determination. If there's any doubt whatsoever, it must proceed past Step 2. And my contention here is that there is enough in this case, adding together the fact that the ALJ did not consider the impairments in combination, did not credit at least five doctor visits during the period of time, and makes a blatant error of fact in saying that there was no records during two years, that in itself is enough to warrant remanding this case so that Mr. Webb can have a full and fair analysis at Step 2 and then proceed on and try to prove that he is disabled at the remaining steps of the sequential analysis. I'd like to reserve any remaining time I have. Thank you. May it please the Court. Good morning. David Bloom for the Commissioner. The Step 2 threshold is a low one, but it's still a valid one, and the test is not whether there is any doubt at all the ALJ has to find for the claimant at Step 2. There are three things that a claimant has to show to pass Step 2, show severe impairments. One is that he has a medically determinable impairment. Another is that those impairments cause significant limitations in his ability to do work-related activities. And the third is that the impairments last for 12 continuous months. The ALJ rationally found that plaintiff did not meet at least the last two parts of that test. The ALJ did find medically determinable impairments, but the ALJ rationally found that they did not significantly limit plaintiff's ability to do basic work activities and that they did not last 12 continuous months. There are significant gaps in treatment here during the relevant time period. And again, we agree that plaintiff did have a serious injury in 1987, but what counts is what were his functional limitations during the relevant period of 1991 through his date last insured, September 30, 1997. He saw the doctor only on intermittent basis during that period, and the medical records indicate either mild problems or that medication controlled his hypertension at least at times and controlled his back pain. In fact, he testified that medication controlled his back pain at pages 406 and 407 of the record, and he took that medication from 1994 through 1998. Mr. Bloom, what's your position in response to Ms. Ziskin's argument that the ALJ made a factual error in thinking that in a particular period she cited that he had not had any doctor visits? Well, I'm curious about it, actually, because by my look at the record, I didn't see any indication that plaintiff went to the doctor during 1997, which was at least the last calendar year of his alleged disability period. I thought she said the ALJ erred by finding that there was a two-year hole in the record in the last two years of his alleged disability. I'm not sure if I got that period right, but by my review of the record anyway, I saw a gap in 1997, and that was not the only gap. I mean, it's not as if the ALJ is arresting his whole decision on that one particular gap. It is a fair summary of that medical record from 1991 to 1997 to say that plaintiff only intermittently sought medical treatment. And, again, I'm kind of curious as to what gap she's talking about because I didn't see anything for 1997. I think that on page 407 of the judges of the ALJ's opinion, he says there is no evidence of medical treatment during 1997. He doesn't say two years for 1997. That's your point. Well, thank you, Your Honor, and that's what I saw too. Furthermore, to reach the development of the record issue, it seems kind of odd to raise that argument here, given that plaintiff's attorney at the hearing, which was admittedly different counsel, on two occasions agreed to the record as it was at that time. At page 398, the plaintiff attorney said he had no further exhibits to add to the record. And at page 434, he agreed to submit the case on the current record as it stood then. Now plaintiff, the new attorney, is arguing, well, the ALJ shouldn't have relied on that. It should have gone on beyond and developed the record further. Well, it's true that an ALJ always does have an independent duty to develop the record. In these circumstances, it would be somewhat unfair to impose that burden. In addition, the call for a consultative examination, the problem with that here is that the hearing was in 2002, and the date last insured was back in 1997.  It's kind of a stretch to send the plaintiff out for a consultative examination in 2002 to ask a doctor what the limitations were back in the 1991 through 1997 period. It's so retroactive that the ALJ rationally instead looked at the sporadic intermittent medical records from that time and relied on those alone. Coming back to the two-year hold, on page 15 of the record, it says there's no evidence of any medical treatment for the next two years until October 1991. And then on page 17, the ALJ comes back to referring to treating records from his 1991 alleged onset date through his 1997 date last insured are relatively sparse and depict a pattern of only transitory and intermittent medical conditions and so on. So what's your reaction to the reference to, on page 15, page 3 of his opinion? The reference on page 3 is incorrect. She's right about that. The ALJ's summary on page 17 of the record that there was sparse and intermittent treatment is correct. Actually, the intermittent treatment in 1991 that the ALJ missed actually works in the ALJ's favor because in February 1991, page 255 of the record, it indicates that his hypertension was much improved, that he was doing well. In May 1991, on page 255 of the record also, it indicates that his hypertension was under good control. So if the ALJ missed those things, it was harmless because it actually was further indication that the plaintiff did not have a severe impairment at that time, shortly before his alleged onset date of August 1, 1991. The ALJ properly rejected plaintiff's credibility as he was required to do in assessing the Step 2 finding. He noted three valid reasons to find plaintiff not entirely credible. One was the sparse intermittent medical treatment. This court held in Fair v. Bowen that sparse treatment, minimal treatment, is a proper reason for an ALJ to find plaintiff not entirely credible. The ALJ also cited plaintiff's daily activities and referred to letters that he had written to prospective employers during the period of alleged disability. Regarding those employment letters... Can I ask you a question? Usually I've seen this issue of an adverse credibility determination in the appeals I've sat on come up at the point where we're assessing the RFC that's set or what gainful employment could be, and not at the Step 2 stage. So is there any precedent as to whether we treat a negative credibility determination differently at the Step 2 level, when it affects the Step 2 level determination, or is it just the same framework? That's an interesting question. I don't know of any precedent that treats it differently. You're looking at a different matter, though, at Step 2, similar to the recent Ukolov case, which I didn't cite, and I'm just answering your question. At Step 2, you're looking at something different. You're looking at whether a plaintiff has medically determinable impairments that significantly affect at all his ability to do work activities. The RFC step is a further refinement of it. You get more specific and try and determine how, and that's precisely how those significant limitations affect his work activities. But it came as a surprise to me, too, actually, that we look at credibility at Step 2, because I do want to make clear that the ALJ was not required to determine plaintiff's residual functional capacity at this step, as plaintiff argued in her opening brief. That doesn't come until later. But under SSR 96-3P, it specifically states that in looking at severity, the ALJ has to consider the entire record, both the medical evidence and lay testimony and plaintiff's credibility. I guess you're just looking to see whether plaintiff's limitations are significant at all, and then you get into it in more detail later on in the sequential evaluation process. Mr. Bloom, you mentioned two bases for the actor's credibility. As far as medical record and daily activities related to his employers, what was the third? The three were objective medical evidence, letters to the employer, and activities of daily living. The letters to the employer aren't in the record. That's true. But it's undisputed that they existed, and it's really not the contents of the letters, but the mere fact that plaintiff would be simultaneously writing to employers saying that I can work and claiming in this instance that he can't. I guess I don't see that. If somebody is not getting disability, you're saying you have to put all your eggs in the basket and you can't make an effort to try and persuade some employer to hire you. I find that to be a catch-22. It is somewhat, but it's also inconsistent. The problem I'm having here generally is Smolin lays out a pretty clear message that it's pretty quite rare to invoke Step 2 unless there's just an absolutely bogus claim, and I find it a little difficult under this record to say that if this case sets the standard under Smolin that we're really living up to what the Step 2 process was. We're beginning to reach a bit, and we start ascribing inconsistent motivation or fact assertions by the claimant because he happens to try and get a job. In any event, they're not in the record. I think we have your position. I would just conclude by saying that you can look at this evidence, and addressing your concern, you can look at this evidence more than one way. I'm not saying plaintiff's interpretation of the evidence is irrational, but the question is really was the ALJ's interpretation of the evidence rational? If you look at it, one way to look at it is the way he did, and that's that the plaintiff received very sparse intermittent medical treatment here, and whether or not any of us would have looked at the same evidence and found something different, that was a rational way to look at it, and therefore this Court should uphold his decision. Thanks. My colleague's closing comment was that there's more than one way to look at this. That's right, and it should be looked at with the benefit of the doubt to the plaintiff. Do you have anything to support your benefit of the doubt argument? The benefit of the doubt comes from the humanitarian nature of the Social Security Act, congressional intent that this be a remedial act with a remedial purpose to help disabled people. How does that square with a substantial evidence standard that tells us that if there's substantial evidence supporting what the ALJ did, we have to defer to it? It squares perfectly, and in this case, there is no substantial evidence. There has to be clear evidence as step two for it to be thrown out, to be a bogus claim, as Judge Fischer characterized it. Where do you get the word clear rather than substantial? Clear comes from you're putting me on the spot, and I'd have to go back to my notes, and I don't, unfortunately, have time to do that. Well, let me ask you, because I am interested in this. Smolin says an impairment or combination of impairments can be found not severe only if the evidence establishes the slight abnormality. And I don't know whether that language from our court coming, which is quoting SSR 8528 and to Yucker, is meant to signal or is interpreted to mean that the burden is much more than just is there substantial evidence to support? I don't know the answer to that, but that's what strikes me about this discussion in Smolin about step two. Yucker has tried to lay out the ground rules. We get a lot of variance in these cases. I haven't seen very many cases, if any, that are kicked out of step two. That's right. It's a rare occurrence, and it should be exercised with great care, as the Social Security ruling says. That brings me to Judge Gould's question to my colleague about normally you look at credibility at step four. Why are you looking at it at step two? There is no controlling precedent in this circuit that says that credibility is a factor here. That comes out of SSR 963P. Well, that's binding on the agency. It's not binding on this court. We're looking at Smolin and Yucker, and there's no mention of credibility findings in there. I'd also like to point out that in defendant's brief below, admittedly written by a different attorney at that level, she almost retracted her argument about this being about credibility. She conceded that the ALJ was really just looking at the lack of objective medical evidence. Okay. Let's not elaborate. It's in the briefs. Okay. I just want to point that out that there is a discrepancy here, and that credibility really should not be looked at at this point. And I appreciate your indulgence in letting me go a little over. Thank you very much. Thanks to both counsel. These are difficult cases, and we appreciate the high quality of the argument. Thank you. Very nice argument. Cases are either submitted.
judges: Fisher, Gould, Bea